Hillsborough-northern judicial district
No. 2006-139

IN THE MATTER OF MARCIE ALBERT AND GOSSETT W. MCRAE, JR.

Argued: January 5, 2007
Opinion Issued: April 18, 2007

*Law Offices of Christopher W. Kelley*, of Nashua (*Christopher W. Kelley* on the brief and orally), for the petitioner.

*Keefe and Browne, P.A.*, of Manchester (*Shaunna L. Browne* on the brief and orally), for the respondent.

BRODERICK, C.J. The respondent, Gossett W. McRae, Jr. appeals a child support order recommended by a Marital Master (*Green*, M.) and approved by the Superior Court (*Lewis*, J.). Among other things, McRae objects to the trial court's inclusion of approximately $75,000 of passive income in its child support calculation. We reverse in part, vacate in part and remand.

The following facts appear in the record or are undisputed by the parties. In September 2004, McRae was divorced from his wife of thirty-eight years. The couple had two adult sons. During the course of his marriage, McRae had a romantic relationship with the petitioner, Marcie Albert, which resulted in the birth of a daughter. In May 2004, during the litigation of the McRaes' divorce, Albert served McRae with a petition for child support for her daughter, who was then nine years old. In April 2005, DNA testing showed that McRae was the father of Albert's daughter, and shortly thereafter, he began making temporary child support payments of $419 per month.

The McRaes had various business interests that were addressed in their divorce decree, two of which are relevant here. The decree required McRae to transfer three percent of his stock in Plastic Techniques, Inc. (Plastic Techniques), a closely held family company, to one of his sons. The

purpose of the transfer was to dissipate McRae's controlling interest in the company. Three months before the divorce was finalized, as the McRaes were negotiating the terms of their permanent stipulation, McRae retired from his position as chief executive of Plastic Techniques and no longer received a paycheck from the company. At the time of his retirement, McRae was sixty-one years old. The divorce decree also awarded McRae all of the couple's right, title and interest in Hyaire, LLC (Hyaire), a real estate holding company in which he held a fifty-percent interest. Hyaire owned two buildings, which were subject to a $1,600,000 mortgage. It rented one building to Plastic Techniques and the other to Bayhead Products.

On the McRaes' 2003 federal income tax return, McRae reported $116,633 in wages and salaries and another $91,178 on the line titled "Rental real estate, royalties, partnerships, S corporations, trusts, etc." On schedule E, the entire $91,178 was identified as schedule K-1 income; that is, income to Hyaire attributed to McRae as passive income due to his status as a member of Hyaire. For 2004, the year he retired from Plastic Techniques, McRae reported $75,543 in wages and salaries, and $85,623 in K-1 passive income. While the tax forms in the record report schedule K-1 income, the record does not include the schedule K-1 forms themselves. On his financial affidavit and at the hearing on Albert's petition, McRae anticipated that in 2005, his gross income would include a $2,000 per month draw from Hyaire, $293 per month in interest and dividends, and approximately $75,000 in K-1 passive income. The K-1 passive income reported on McRae's tax returns was income to Hyaire that, under the federal tax code, is reported on the individual tax returns of the members of the LLC. *See* 26 U.S.C. §§ 1361 *et seq.* (2000).

At the hearing, McRae testified that the Hyaire income he reported on his tax returns was not actually available to him because it was used to pay the mortgage on the LLC's two rental properties. However, the record includes no documentation indicating Hyaire's rental income or the amount of Hyaire's mortgage payments. Thus, apart from McRae's testimony, the record does not indicate whether Hyaire had any retained earnings and, if so, how much they were. McRae also explained that Hyaire was set up as a tax shelter, and was near the end of its life cycle, meaning that it had already taken much of the available depreciation on its buildings, and was paying its mortgage lender much more principal than interest. In such a situation, McRae testified, he, as a member of the LLC, was obligated to report substantial income that was offset by few deductions and that was not actually available to Hyaire or to him. Conversely, he testified, at the earlier end of its life cycle, when Hyaire could offset income with deductions for accelerated depreciation and

interest payments, he was able to claim a loss for tax purposes while actually having considerable actual income from Hyaire in the form of distributions of profit. But, again, the record does not include any documentation of Hyaire's gross rental income or its mortgage payments.

Prior to the hearing on Albert's petition, McRae prepared a financial affidavit listing his gross income as $2,293 per month and a child support guidelines worksheet listing Albert's gross income as $2,000 per month. He did not initially list his K-1 passive income, but during a recess in the hearing, he amended his affidavit to include several previously unlisted assets as well as "$75,000 [yearly] attributed to myself as a member of LLC." Based upon the income he initially listed on his financial affidavit, McRae proposed that his child support obligation should be $444 per month, retroactive to May 11, 2004, the date upon which he was served with Albert's petition. He also proposed to pay an arrearage of $5,028 in monthly installments of $20.

After a hearing, the trial court ordered McRae to pay Albert $335 per week, based upon an annual income of approximately $100,000. In the words of the Master:

> The court finds it is not unreasonable to look at what Mr. McRae reports to the United States government as his income for tax purposes in determining child support. If one includes his $2200 a month in income plus $70,000 to $80,000 in passive income, we are looking at a person, who for tax purposes, earns $100,000 plus or minus. The court will utilize that figure in determining the appropriate obligation to pay for child support.

In addition, the trial court ordered McRae to pay child support retroactively to April 13, 2004, and ordered him to pay an arrearage of $27,470 within ninety days. Finally, the trial court observed in its narrative order that McRae "is actively participating in the family business [Plastic Techniques] as his son is currently in Iraq," and concluded under item 18 of the uniform support order that McRae "ha[d] voluntarily reduced his income and ha[d] an ownership interest in several companies." However, the trial court did not check the box on the uniform support order that provides: "Obligor is unemployed and MUST REPORT EFFORTS TO SEEK EMPLOYMENT." On McRae's motion for reconsideration, the trial court adjusted the starting date of his obligation to May 11, 2004, but denied relief on all the other grounds McRae raised. This appeal followed.

I

According to McRae, the trial court erred by including his projected K-1 passive income for 2005 in determining his child support obligation, and

unsustainably exercised its discretion by imposing a ninety-day deadline for payment of his arrearage and by failing to deduct from that arrearage the child support payments he began making in May 2005. He also argues that the trial court erred by finding that his decision to retire constituted a voluntary reduction of income intended to circumvent his child support obligations and unsustainably exercised its discretion by imputing income to him based upon a finding of voluntary unemployment. We consider each issue in turn.

## II

Whether the trial court should have included McRae's K-1 projected passive income as part of his gross income as defined under RSA 458-C:2, IV (2004) is a question of law which we review *de novo*. *See In the Matter of State & Taylor*, 153 N.H. 700, 702 (2006) (treating whether trial court correctly ruled that lump sum personal injury settlement was "gross income" as matter of statutory construction); *Mortgage Specialists v. Davey*, 153 N.H. 764, 774 (2006) ("interpretation of a statute . . . is a question of law that we review *de novo*"). Because the determination of whether income to an LLC that is reported on a member's individual tax return is "gross income" as that term is defined in the child support statute is a question of law, we must necessarily reject the petitioner's argument that the respondent's initial failure to disclose his projected $75,000 in K-1 passive income was a factor that justified the trial court's inclusion of that income in its support calculation. While a party's credibility and forthrightness are factors for a trial court to consider when accepting evidence of *net* income, *see In the Matter of Crowe & Crowe*, 148 N.H. 218, 223 (2002), a finding that McRae was not credible or forthright would not have given the trial court the authority to categorize as gross income an item not otherwise includable under the statute.

Turning to the question before us, the relevant statute provides, in pertinent part:

> "Gross income" means all income from any source, whether earned or unearned, including, but not limited to, wages, salary, commissions, tips, annuities, social security benefits, trust income, lottery or gambling winnings, interest, dividends, investment income, *net rental income*, self-employment income, alimony, business profits, pensions, bonuses, and payments from other government programs . . . .

RSA 458-C:2, IV (emphasis added). The respondent testified, without contradiction, that the income at issue is the rent that Plastic Techniques and Bayhead Products paid Hyaire, income that Hyaire used to pay the

mortgage on its two rental properties. Thus, the question before us is whether the Hyaire income attributed to the respondent was gross rental income or net rental income.

■ While the record does not indicate the amount of Hyaire's mortgage payments, McRae testified that the $75,000 in passive K-1 income he expected to report in 2005 was either paid out to him in the form of his $2,000 monthly draw or was paid to Hyaire's mortgage lender. Any part of that $75,000 that was paid to the mortgage lender was not "net rental income" that would be included as "gross income" under RSA 458-C:2, IV. That statute expressly states that "gross income" includes, but is not limited to, the items listed therein, which allows the trial court to count as gross income items that are not specifically listed in the statute. *See, e.g., In the Matter of Dolan and Dolan*, 147 N.H. 218, 221-22 (2001) (counting exercised stock options as gross income). But here, where the statute specifically qualifies the term "rental income" with the adjective "net," we cannot ignore the qualifier and include rental income above and beyond the amount a landlord nets. *See Winnacunnet Coop. Sch. Dist. v. Town of Seabrook*, 148 N.H. 519, 525-26 (2002) ("When construing a statute, we must give effect to all words in a statute and presume that the legislature did not enact superfluous or redundant words."); *cf. In the Matter of Jerome & Jerome*, 150 N.H. 626, 629 (2004) (holding that legislature's use of the term "annuities," without qualification, indicated legislature's intent to include all annuities, not just certain annuities, in "gross income"). Because the legislature plainly limited the rental income to be included as gross income for child support purposes to net rental income, to whatever extent the trial court determined that Hyaire income actually paid to Hyaire's mortgage lender was McRae's income for child support purposes, it erred, as a matter of law. However, because the record does not include any information on the amount of rent Hyaire actually took in or the amount of its mortgage payments, the extent of the trial court's error will have to be determined on remand.

■ Both the trial court and Albert relied upon the fact that McRae's passive income was reported on his federal income tax returns, but that reliance is misplaced. We recently explained that "how federal income taxation statutes define 'income' is of little relevance to our interpretation of gross income under the child support guidelines." *Taylor*, 153 N.H. at 704. This is so because "[t]he objectives of the child support guidelines . . . differ from the objectives of the federal income taxation statutes." *Id.* at 703-04. Thus, it is not incongruous for us to hold that an item of taxable income does not qualify as gross income for child support purposes.

The Kansas Supreme Court has noted in a case involving issues similar, but not identical, to those before us: "Few courts rely solely on personal income tax returns to determine the amount of income available for purposes of calculating support. Taxable income of a Subchapter S corporation which is attributable to a shareholder does not reflect actual income received as a cash distribution." *In re Marriage of Brand*, 44 P.3d 321, 328 (Kan. 2002). The facts of this case demonstrate why income tax returns are an unreliable guide to the income available for child support purposes. McRae testified that because Hyaire has depreciated its buildings and is now paying mostly principal to its mortgage lender, it has few deductions to claim and shows a "paper" profit for income tax purposes, while producing very little actual cash for itself or its members. Conversely, he testified that early in Hyaire's life cycle, he was able to claim losses for federal income tax purposes while realizing a substantial amount of cash, presumably in the form of distributions of profit. While the question is not before us, we can easily envision a situation in which a member of an LLC such as Hyaire could demonstrate "paper" losses for IRS purposes but have a substantial income that could be drawn upon for child support. Our point is this: the fact that Hyaire's payments of principal are not deductible on McRae's income tax return does not make the money used to make those payments available to him for paying child support.

Regarding the tax treatment of subchapter S corporations, which also applies to the LLC in this case, the Kansas Supreme Court explained:

> Although a Subchapter S corporation may distribute income, it is not required to do so. Earnings are owned by the corporation, not by the shareholders. Subchapter S corporations may accumulate profits, referred to as 'retained earnings.' Retained earnings are the net sum of a corporation's yearly profits and losses.
>
> Subchapter S status provides an alternate method of taxing a corporation's income. In a Subchapter S corporation, income tax is paid by the shareholders rather than by the corporation itself. When the tax is paid by the individual, the corporation avoids income tax liability.
>
> A Subchapter S corporation allocates various items of income to shareholders based upon the shareholder's proportionate ownership of stock. Allocations are itemized on an individual shareholder's Schedule K-1.

*Id.* at 325 (citations omitted). Here, McRae reported an annual draw of $24,000 from Hyaire and recognized, as he must, that his draw is available

for child support purposes. Albert does not argue that McRae received any distributions from Hyaire other than his draw or that Hyaire had any retained earnings, both of which probably qualify as gross income under RSA 458-C:2, IV. *See Mitts v. Mitts*, 39 S.W.3d 142, 148 (Tenn. Ct. App. 2000) (counting as income for child support purposes distributions made to minority shareholder from corporate earnings); *Brand*, 44 P.3d at 327-28 (explaining that in some jurisdictions, subchapter S corporation's retained earnings are considered income to shareholders for child support purposes). The question before us is limited solely to the Hyaire income allocated to McRae. Because the record does not allow a determination of Hyaire's net rental income, *i.e.*, the amount of income retained by Hyaire after payment of its mortgage and other expenses, the trial court's determination of McRae's gross income is vacated and the case is remanded for a further evidentiary hearing on this issue and a recalculation of McRae's child support obligation, including the amount of his arrearage.

## III

McRae argues that the trial court unsustainably exercised its discretion by ordering him to pay his child support arrearage within ninety days of its order. Because we have vacated the trial court's calculation of the amount of his child support arrearage, making the amount of his arrearage undetermined, his argument that the trial court unsustainably exercised its discretion by ordering full payment within ninety days is moot. The factors cited by the respondent may or may not apply with equal force to the arrearage the trial court recalculates on remand. And of course, on remand, both parties are free to argue for what they believe to be an equitable schedule for paying the calculated arrearage.

## IV

McRae argues that the trial court unsustainably exercised its discretion by failing to reduce the assessed arrearage by the amount of the child support payments he began making in May 2005. The petitioner does not suggest any reason why McRae was not entitled to such a credit, but only that the record does not support his claim that he was denied credit for the payments he made, and that absent such record support, we must assume that the record supports the trial court's decision. We disagree.

The trial court ordered McRae to pay an arrearage of $27,470, based upon a weekly child support obligation of $335. The total amount of the assessed arrearage divided by 335 equals eighty-two. There are approximately eighty-six weeks between April 13, 2004, and the date of the trial court's order, and approximately eighty-two weeks between the

correct retroactive date, May 11, 2004, and the date of the trial court's order. Thus, the record appears to establish that the trial court's listing of the April date was a scrivener's error and that the court based its arrearage calculation upon the correct retroactive date, but did not deduct the amount that the respondent has already paid to the petitioner. That was an error, and should be corrected on remand.

V

McRae argues that the trial court: (1) committed reversible error by finding that his decision to retire was both unreasonable and an attempt to avoid his support obligation to his daughter; and (2) unsustainably exercised its discretion by imputing income to him based upon a determination that he was voluntarily underemployed.

As we have already noted, the trial court stated, under item eighteen of its uniform support order: "Obligor has voluntarily reduced his income . . . ." However, notwithstanding its statutory authority to impute income to a voluntarily unemployed or underemployed parent, *see* RSA 458-C:2, IV(a), the trial court in this case demonstrably did not impute any income to McRae based upon its finding of voluntary income reduction. Rather, the trial court based its child support calculation upon gross income of $100,000, composed of McRae's draw from Hyaire ($24,000), his investment income ($2,400), and his projected passive income from Hyaire (between $70,000 and $80,000). Because we are remanding for reconsideration of the child support award, we vacate the trial court's finding that McRae voluntarily reduced his income. Upon remand, if the trial court revisits this issue, it shall make specific findings of fact and rulings of law to assist in any appellate review. In addition, in assessing the reasonableness of McRae's retirement, the trial court should address the unique facts of this case and consult our opinion in *In the Matter of Arvenitis & Arvenitis*, 152 N.H. 653, 657 (2005), which adopts the reasonableness test set out in *Pimm v. Pimm*, 601 So. 2d 534, 537 (Fla. 1992) (superseded by statute on other grounds).

> *Reversed in part; vacated in part; and remanded.*

DALIANIS, DUGGAN, GALWAY and HICKS, JJ., concurred.