Filed 10/30/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of ROSALINDA and GEORGE DELUCA. | D071379 |
| ROSALINDA DELUCA, | |
| Appellant, | (Super. Ct. No. D533280) |
| v. | |
| GEORGE DELUCA, | |
| Appellant. | |

APPEALS from a judgment of the Superior Court of San Diego County, Lisa C. Schall, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Higgs, Fletcher & Mack, John Morris and Rachel E. Moffitt for Appellant Rosalinda Deluca.

Stephen W. Hogan for Appellant George Deluca.

In this marital dissolution action between Rosalinda Deluca and George Deluca, both parties appeal from a judgment determining the division of property and other

matters, including spousal support.[1]  During the marriage, George's sister transferred to him title to an apartment complex referred to in this case as the Florida Street property. Rosalinda contends the trial court erred in ruling the Florida Street property was George's separate property rather than community property.  George has custody of the parties' two children and contends the court erred by awarding Rosalinda spousal support in an amount greater than his total net income available to support the children.  Specifically, he asserts the court erred by including the amount of monthly loan principal payments he is required to make on his income-producing properties as income available for spousal support.

We reverse the portion of the judgment awarding the Florida Street property to George as his separate property and remand with directions to characterize that property as community property and determine the amount of reimbursement to which George is entitled for his separate property contributions to the acquisition of the property under Family Code section 2640.[2]  We also reverse the spousal support award and direct the trial court to reconsider spousal support after determining the extent to which George's loan principal payments reasonably and legitimately reduce his income for purposes of support.  We otherwise affirm the judgment.

---

[1]    As is customary in family law cases, we will refer to the parties by their first names for convenience and clarity, intending no disrespect.

[2]    All subsequent statutory references are to the Family Code unless otherwise specified.

2

FACTUAL AND PROCEDURAL BACKGROUND

A. *Background Facts*

George and Rosalinda were married on September 7, 1996, and separated 15 years and two months later, on November 21, 2011. They had two children during the marriage—one born in 1998, and the other in 2003. At the time judgment was entered, George had sole physical custody of the children.[3]

Before and during the marriage, George owned and operated an insurance agency. He also owned and managed several income-producing rental properties that the court found to be his separate property. Rosalinda has a bachelor's degree in political science and a paralegal certificate. She worked as a legal secretary for over 26 years, including throughout the marriage.

B. *The Deluca Properties Trust Litigation*

Before George's father died in 1990, he acquired multiple parcels of real property that he held in various trusts, including the Deluca Properties Trust that contained the Florida Street property. George, his brother Sylvester, and his sister Rosalie were the beneficiaries of the Deluca Properties Trust. After their father's death, disputes over his trusts led to four and one-half years of litigation between George and his siblings.

On October 25, 1996, just after George married Rosalinda, the three siblings entered into a written agreement (the settlement agreement) to resolve their litigation over the family properties. The settlement agreement noted the existence of "claims, demands

---

[3]     The parties' oldest child turned 18 years old and was emancipated in July 2016.

and differences" between the parties relating to the ownership and management of the subject properties and the administration of the Deluca Properties Trust, and stated the parties had "settled all of these claims, demands, differences and disputes . . . ."

Under the settlement agreement, George received title to three properties: (1) a commercial property in Santee (referred to as the Santee Property); (2) a commercial property in Encinitas (referred to as the Encinitas Property); and (3) a commercial property on Orange Avenue in San Diego (referred to as the Orange Property). Rosalie received title to the Florida Street property and a promissory note from George in the amount of $75,000. The note was to be secured by a first priority deed of trust encumbering the Orange Property. Sylvester agreed to forgive an outstanding debt Rosalie owed him in the amount of $32,000. Sylvester received title to a property on West Palm Street in San Diego and a promissory note from George in the amount of $250,000. The note was to be secured by a third priority deed of trust encumbering both the Santee Property and the Encinitas Property.

The settlement agreement provided that "[i]n exchange for receiving the Santee, Encinitas and Orange Properties, GEORGE relinquishes his right to receive or claim an interest in any of the assets of the [Deluca Properties] Trust, and expressly agrees that he is no longer a beneficiary of the Trust[,]" and that "all assets of the Trust belong solely to ROSALIE and SYLVESTER . . . ." The settlement agreement also provided: "This agreement may be amended only by a written agreement executed by all the Parties."

4

C. *George's Later Acquisition of the Florida Street Property*

At trial, George testified that Rosalie never wanted the Florida Street property. So in September 1997, roughly one year after the original settlement agreement, George and Rosalie signed another agreement under which Rosalie transferred title to the Florida Street property to George. This second agreement, labeled "AMENDMENT TO SETTLEMENT AGREEMENT AND MUTUAL RELEASE," states that it amends "that Agreement of Settlement and Mutual Release . . . executed October 25, 1996, by and between Rosalie . . . George . . . and Silvester [*sic*]. . . . This amendment does not in any way [affect] the terms of the original settlement with respect to George . . . and Silvester . . . or as between Rosalie . . . and Silvester . . . , and makes no other changes or modification, other than those set forth herein."

The "amendment" to the settlement agreement provided that Rosalie would transfer the Florida Street property to George by grant deed, and George would execute a promissory note to Rosalie in the amount of $164,700, secured by the Florida Street property. George would "have the option to assume the first deed of trust on [the] property, in the approximate amount of $235,300 or continue making the monthly payments on [the] first deed of trust." George would also pay $20,000 in cash to Rosalie at the close of escrow. Thus, what George referred to at trial as the "transfer price" of the Florida Street property was $420,000 ($164,700 + $235,300 + $20,000), which was the value of the property when it was appraised in 1995, in connection with the original settlement agreement.

5

The amendment to the settlement agreement stated: "It is expressly agreed between the Parties that this exchange and transfer of ownership to the Florida Street property is an extension of and modification of the Parties' original settlement agreement . . . , and the Parties' express intent herein is to redistribute trust assets." It also stated: "Except as expressly stated herein, all other terms and provisions of the original settlement agreement remain in full force and effect, without modification or change." George and Rosalie signed the amendment; Sylvester did not sign it.

At trial, George testified that he had many conversations with Rosalinda about the Deluca properties and that as "my fiancée, my wife, my confidant, [Rosalinda] was aware of everything that was happening in the litigation [with his siblings] so I'm sure she had a chance to see [the settlement agreement] numerous times if she wanted to or she glanced at it. It was available for her." He also testified that he provided Rosalinda a copy of the trust that was the subject of the litigation.

George testified that he told Rosalinda his sister was transferring the Florida Street property to him and the property was his inheritance. He explained that the Florida Street property had been part of his family trust, his parents had built the apartment building on the property, and it was to remain his separate property. He gave Rosalinda a copy of the amendment to the settlement agreement before the close of escrow on Rosalie's transfer of the Florida Street property to him, and he discussed the terms of the amendment with her. When asked if Rosalinda "[made] any reply" to him about the terms of the amendment, George testified, "She thought it was good."

6

At George's request in January 1998, Rosalinda signed a quitclaim deed transferring any interest she had in the Florida Street property to George as his sole and separate property. When George refinanced the property in 2002, Rosalinda signed a "SPOUSAL ACKNOWLEDGEMENT" document stating that she claimed no ownership rights in the Florida Street property.

Rosalinda testified at trial that when she and George were dating, he told her that he was involved in litigation with his brother regarding the "trust for his inheritance," but he did not tell her any details about his claims. He never provided her with a copy of any of the family trusts, and he never discussed the details of the terms of the settlement agreement between him and his siblings or the amendment to the settlement agreement before or during the marriage. The first time she saw the settlement agreement and the amendment to the settlement agreement was during the divorce proceedings, and George did not tell her anything about terms of the amendment to the settlement agreement when he asked her to sign the quitclaim deed to the Florida Street property. He told her the Florida Street property was part of his inheritance and his sister was going to transfer it to him as part of the inheritance because she was unable to manage the apartments. He explained that his lender needed the quitclaim deed "to get everything through." She did not seek legal advice before signing the quitclaim deed because she trusted her husband and "just signed it."

Rosalinda's counsel argued at trial that the Florida Street property should be divided as community property because George purchased it from his sister during the marriage with community funds. Counsel further argued that George induced Rosalinda

7

to sign the quitclaim deed to the Florida Street property by undue influence in breach of the fiduciary duty he owed her because she did not sign the quitclaim deed with full knowledge of the material facts, her signing it unfairly advantaged George, she waived a valuable right by signing it, and she received no consideration for signing it.

George's counsel argued that Rosalinda knew she had no interest in the Florida Street property, knew it was part of George's inheritance, and knew the effect of the quitclaim deed—i.e., she knew that if she had any interest in the property, she was transmuting it. He argued that the presumption of undue influence had been rebutted by evidence that Rosalinda "knew at all times that these properties were being handed down through the family. Even if he had to make a payment to his siblings, the payment was supported by the loans on the commercial properties and the loans on the commercial properties were supported by the commercial properties themselves . . . ."

D. *Statement of Decision and Judgment*

1. *Character of the Florida Street property*

In its "Final Statement of Decision and Judgment," the trial court ruled that the Santee Property, the Encinitas Property, and the Orange Property were George's separate properties under section 770 "in that they were received through inheritance and devise."[4] The court relied on the fact that George acquired the properties through the

---

4    Section 770, subdivision (a) provides: "(a) Separate property of a married person includes all of the following: [¶] (1) All property owned by the person before marriage. [¶] (2) All property acquired by the person after marriage by gift, bequest, devise, or descent. [¶] (3) The rents, issues, and profits of the property described in this section."

settlement agreement between him and his siblings, which was reached before the marriage but executed two months after the marriage. It found that all of the properties at issue in the litigation between George and his siblings were "a direct result of an inheritance received and an agreement devising the real properties at issue."

Regarding the Florida Street property, the court determined that George "met his burden of proof to establish that the real property is his separate property . . . in that it was received through inheritance and devise." His acquisition of the Florida Street property was "memorialized" by the amendment to the settlement agreement, which "provided for the same value of the property that existed at the time of the original Settlement Agreement and Mutual Release . . . ." Rosalinda, in turn, "freely and voluntarily executed a Quit Claim Deed at the time of the transfer of the property to [George]." She testified that she read the quitclaim deed before she signed it and that George did not threaten her to make her sign it. When George refinanced the property in 2002, Rosalinda "executed a spousal acknowledgement indicating that she claimed no ownership interest in the property . . . ." Noting that the Florida Street property was solely in George's name during the marriage, the court found that "[t]he community did not acquire an interest in the property by way of pay down of principal (as established through the tracing report of [George's expert witness, accountant Anna Addleman])."

The court ruled that George met his burden of proof by substantial evidence to overcome any presumption of undue influence and unfair advantage in his relationship with Rosalinda, and that Rosalinda did not present sufficient evidence to support a finding of constructive fraud. Based on findings that Rosalinda had access to legal

9

advice because she worked in a law firm, and that George discussed the amendment to the settlement agreement with her and informed her that his sister would transfer the Florida Street property to him under the agreement, the court concluded Rosalinda executed the quitclaim deed and spousal acknowledgment regarding the Florida Street property "freely and voluntarily, and with full knowledge of all the facts, and with understanding of the effect of the transfers."

The court found that Addleman's tracing report accurately traced the payments on the Florida Street property, reflecting that $974 of community funds were used to pay down the principal on the property, and that "the indirect tracing (Recapitulation/Family Expense) by Ms. Addleman [was] accurate and properly provide[d] for tracing of separate property. (See findings in (b) above)."[5] Observing that the loans against the property were solely in George's name, the court found "the lender relied upon the rent/profitability of the property itself to underwrite the loan . . . ."

---

[5] The "findings in (b) above" were the court's findings regarding the Santee, Encinitas, and Orange properties. In that section of its statement of decision and judgment, the court explained indirect tracing as follows: "Payments may be traced to a separate property source based upon a showing that the community income throughout the marriage was exhausted by family expenses, such that any sums devoted to separate property were necessarily separate in origin. This method is called the 'Recapitulation' or 'Family Expense' method. 'Under the "family living expense" or "recapitulation" method, it is assumed that family living expenses are paid out of community property funds. [Citations.] Payments may be traced to a separate property source by showing community income at the time of the payments or purchase was exhausted by family expense, so that the payments or purchase necessarily must have been made with separate property funds.' " (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 823 (*Braud*).)

## 2. *Income available for support*

The court noted that George had self-employment income from his insurance agency and rental income from his real property. It found George's monthly self-employment income was $7,281, based on the "competing testimony" of George's expert witness Addleman, and Rosalinda's expert witness, accountant Karen Kaseno.

According to Addleman's report, George's monthly average income was $25,332 before principal payments on the loans against his commercial and residential properties. The court noted that Kaseno had testified it would not be appropriate to reduce George's income available for support by the amount of his principal payments on his separate property,[6] and that Addleman's position was that if the court "set support without consideration for the principal payments [George] would ultimately be unable to pay for the real properties he needs to generate income and he would lose the properties themselves." It concluded Addleman's reasoning was "flawed[,]" stating: "Payments made to solely benefit the separate property of [George] cannot operate to reduce his income available for support. If that were the case then any party could divert income to the benefit of their separate property at the exclusion of being considered income available for support." The court added that "[n]either party provided the Court with any

---

6      Rosalinda's expert Kaseno testified that she disagreed with Addleman's subtracting George's loan principal payments from his income available for support. She explained, "Payments of principal [are] not normally deducted from a party's income available for support. When you're paying off your principal, you're basically increasing your net worth. You are paying money that is paid down on your debt obligation. It's not an expense, an accounting term, and it's basically increasing your net worth."

11

case authority addressing this issue."  Based on Addleman's report, it found George's combined self-employment income and separate property rental income available for support was $25,332.  The court imputed annual income of $60,000 to Rosalinda ($5,000 per month) based on her earning capacity.

The court found that during the marriage the parties enjoyed an upper middle class lifestyle, which "was in large part supplemented by the separate property income of [George]."  Rosalinda "had been living rent free for approximately the last three years[,]" and George had been "living in a 2 million dollar plus residence in Point Loma."  During the marriage, the parties traveled to Europe each year, which "in large part was supported by the separate property residence that [George] inherited from his mother."  The court noted that Rosalinda had been able to put money into a profit-sharing plan and a 401(k) account when she was employed, the parties drove older vehicles, and the minor children were enrolled in private schools.

The court ordered George to pay spousal support of $7,500 per month.  The court explained that although Rosalinda had made minimal efforts to become self-supporting and had the ability to earn $60,000 per year, George's total income was $25,332 per month and he lived with the children in a home valued in excess of $2 million. Rosalinda, on the other hand, "live[d] with her sister's extended family and no longer [had] any of the [lifestyle] comforts she once shared with [George]."

We will include additional relevant facts in our discussion of the legal issues.

DISCUSSION

A. *Characterization of the Florida Street Property*

Rosalinda contends the trial court erred in ruling the Florida Street property was George's separate property. She correctly notes the Florida Street property is presumed to be community property because it was acquired during marriage, and asserts that no exception to the community property presumption applies. She further maintains that her signing a quitclaim deed stating the property was George's sole and separate property was ineffective to transmute the property from community property to George's separate property because George did not rebut the presumption of undue influence as to that transaction. As we will explain, we agree with these contentions. We further conclude that George's tracing evidence was insufficient to rebut the community property presumption because it did not establish that George's payments for the Florida Street property from the date he acquired it in 1997 to 2001 were solely from his separate property funds.

Section 760 provides that "[e]xcept as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property." Commenting on this general rule, the court in *In re Marriage of Haines* (1995) 33 Cal.App.4th 277 explained: "A basic rule of a community property system is that all property acquired during marriage is community property unless it comes within a specific exception; the major exceptions to the basic community property rule are those relating to separate property. [Citation.] Thus, there is a general presumption that property acquired during marriage by either

spouse other than by gift or inheritance is community property unless traceable to a separate property source. [Citations.] This is a rebuttable presumption affecting the burden of proof; hence it can be overcome by the party contesting community property status. [Citation.] Since this general community property presumption is not a title presumption, virtually any credible evidence may be used to overcome it, including tracing the asset to a separate property source, showing an agreement or clear understanding between parties regarding ownership status and presenting evidence the item was acquired as a gift." (*Id.* at pp. 289-290, fn. omitted.) " 'The status of property as community or separate is normally determined at the time of its acquisition.' " (*In re Marriage of Buol* (1985) 39 Cal.3d 751, 757, quoting *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 591.)

In general, "factual findings that underpin the trial court's characterization of property as separate or community property are reviewed for substantial evidence." (*In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 734.) However, de novo review is appropriate where " 'the determination in question amounts to the resolution of a mixed question of law and fact that is predominantly one of law.' " (*Ibid.*)

1. *George did not acquire the Florida Street property by inheritance or devise.*

George starts by contending substantial evidence supports the court's finding that he acquired the Florida Street property "through inheritance and devise." He maintains the settlement agreement between him and his siblings established their respective inheritances of the various family properties, including the Florida Street property, and asserts he acquired the Florida Street property through the "amendment" of that

14

agreement. Essentially, George argues that the purported amendment to the settlement agreement operated as an instrument of devise that changed the Florida Street property from his sister's inherited property to his inherited property. We conclude otherwise, holding that, as a matter of law, the amendment to the settlement agreement was a contract by which George purchased the Florida Street property from his sister. Accordingly, George did not acquire the Florida Street property through inheritance or devise; he acquired it by purchase during marriage.

As previously noted, the settlement agreement between George and his siblings provided that "[i]n exchange for receiving the Santee, Encinitas and Orange Properties, GEORGE relinquishes his right to receive or claim an interest in any of the assets of the [Deluca Properties] Trust, *and expressly agrees that he is no longer a beneficiary of the Trust*." (Italics added.) The italicized language establishes that George's "inheritance" as a trust beneficiary was fully and finally established by the settlement agreement and there was no additional property he stood to acquire by "inheritance or devise" after the agreement's execution and performance. George acknowledged that fact at trial when he testified, in response to questioning by the court, that as of November 7, 1996 (the date a grant deed was recorded showing title to the Florida Street property in the name of George's sister Rosalie), the Florida Street property "was no longer part of any inheritance that [he] had a legitimate right to . . . ."

Thus, Rosalie was the sole owner of the Florida Street property before George acquired it from her. Being the property's sole owner, Rosalie was the only person who could have transferred the Florida Street property to George or anyone else in 1997. The

15

written agreement (amendment to the settlement agreement) by which George acquired the property from Rosalie was not a transfer of property by gift, bequest, devise, or inheritance.

Black's Law Dictionary defines "inheritance" as "[p]roperty received from an ancestor under the laws of intestacy" or "[p]roperty that a person receives by bequest or devise."  (Black's Law Dictionary (10th ed. 2014) p. 903, col. 1.)  The definition of "bequest" is "[t]he act of giving property . . . by will" or "[t]he money or other property that a person arranges to give to someone or an organization upon death; esp., property . . . disposed of in a will."  (*Id.* at p. 189, col. 2.)  The four definitions of "devise" are:  "**1.** The act of giving property by will. . . .  **2.** The provision in a will containing such a gift.  **3.** Property disposed of in a will.  **4.** A will disposing of property."  (*Id.* at p. 547, cols. 1-2.) The definition of "descent" is "[t]he acquisition of real property by law, as by inheritance; the passing of intestate real property to heirs."  (*Id.* at p. 539, col. 1.)

The agreement by which Rosalie transferred the Florida Street property to George does not fall within any of these definitions.  George did not receive the property under the laws of intestacy, by will or trust, or as a direct consequence of any person's death; accordingly, he did not acquire it by inheritance or by "bequest, devise or descent" within the meaning of section 770.  George received the property under an agreement with Rosalie by which she deeded the property to him in exchange for valuable consideration

16

in the form of cash, a promissory note, and George's assumption of the obligation to pay off the existing loan on the property.[7]

In short, George purchased the Florida Street property from his sister. The transaction falls squarely within Black's Law Dictionary's definition of "contract for sale," which is: "A contract for the present transfer of property for a price." (Black's Law Dictionary (10th ed. 2014), p. 392, col. 1.) Because uncontroverted evidence shows that George acquired the Florida Street property through a purchase-sale contract, the trial court erred in finding that the community property presumption was rebutted by evidence that he acquired the property "through inheritance and devise."[8]

Even if the settlement agreement could have been amended one year later in a way that effectively changed the siblings' inheritances, the amendment that George and Rosalie executed was ineffective to do so because it was not signed by Sylvester, as the settlement agreement expressly required. Although the absence of Sylvester's signature on the amendment does not invalidate it as a purchase contract *between George and Rosalie*, it does render it invalid as an amendment of the original settlement agreement.

---

[7]     " 'A valuable consideration means a pecuniary consideration.' " (*Morse v. Wright* (1882) 60 Cal. 260.)

[8]     George inadvertently acknowledged that he purchased the Florida Street property in the following exchange with the court during his trial testimony. The court asked George, "You had a conversation with [Rosalie] and she gave you an impression she was kind of forced into taking the Florida property. Is that what I'm hearing?" George replied, "Yes." The court asked, "You had a conversation with her. She said she didn't want it and she offered what, for you to *buy it*?" (Italics added.) George answered, "Yes, to amend the original settlement agreement and transfer it into my name."

17

Consequently, the amendment could not operate to change any of the three siblings' respective inheritances established by the original settlement agreement.

2. *The "inception of title" theory does not apply.*

George also argues that the Florida Street property is his separate property under the equitable theory of inception of title, citing *In re Marriage of Joaquin* (1987) 193 Cal.App.3d 1529 (*Joaquin*). The *Joaquin* court explained that under the inception of title theory, the status of property as separate or community property "depends upon the existence or nonexistence of the marriage at the time of the incipiency of the right by virtue of which the title is finally extended and perfected; the title when so extended and perfected relates back to that time." (*Id.* at p. 1533.) In other words, the character of a property as separate or community depends on when the *equitable right* to the property was acquired—i.e., whether the spouse who acquired the property was single or married at the time of the inception of his or her equitable right to the property. "Under this rule, property to which one spouse has acquired an equitable right before marriage is separate property, though such right is not perfected until after marriage . . . ." (*Ibid.*) Thus, property that a spouse purchased before marriage subject to a condition precedent remains the spouse's separate property even though satisfaction of the condition resulting in the spouse's acquisition or perfection of legal title occurs during marriage. (*Ibid.*) The *Joaquin* court applied "principles respecting lease renewals/extensions/options, and inception of title" (*Id.* at p. 1534), to conclude that where the husband in that case acquired a leasehold with an option to renew the lease before marriage, remained in continuous possession of the leasehold, and exercised his option to renew the leasehold

18

during marriage, the renewed leasehold remained his separate property because "once exercised, the option . . . transfer[s] an equitable interest in the land relating back to the time the option was given." (*Id.* at p. 1533.)

George contends, in his words, that he "acquired an equitable interest in all the properties that he and his siblings inherited when their father died before this marriage." He reasons that because he had some undetermined interest in and, therefore, an equitable right to all of the family trust assets before marriage, his acquisition of the Florida Street property from his sister in 1997 simply perfected his preexisting equitable right. Accordingly, he claims, the trial court "achieved equity by characterizing the Florida Street property as his separate property."

George's inception of title argument is unpersuasive. Although he had some undetermined interest in some undetermined portion of the family trust assets before the marriage and before he entered into the settlement agreement that fixed his interest, there was no evidence that, before the marriage, he had an unperfected equitable right to acquire the Florida Street property *in particular* as its sole owner under some condition precedent that would later mature into full legal title. The inception of George's title to the Florida Street property did not occur until he and Rosalie executed the "amendment" to the settlement agreement effecting his purchase of the property from her. There was no evidence of an inception of unperfected equitable title to the Florida Street property solely in George's name before marriage. Accordingly, there was no equitable basis to characterize the Florida Street property as George's separate property despite his acquisition of the property during marriage.

19

3. *George's tracing evidence was insufficient to show he acquired the Florida Street property solely with separate property funds.*

George additionally contends that substantial evidence supports the court's characterization of the Florida Street property as his separate property because his expert, Anna Addleman, accurately traced the Florida Street property to George's separate funds. Addleman concluded that in 15 years, George applied only $974 of community funds to the Florida Street property. We conclude, however, that this tracing evidence does not rebut the presumption that the Florida Street property was community property when George acquired it because Addleman was unable to sufficiently establish the source of funds paid on the property from the time George acquired it in 1997 through 2000.

Property acquired during marriage can be shown to be separate property by two different tracing methods—direct tracing and indirect tracing. The focus of George's argument here is indirect tracing, which "involves a consideration of family expenses. It is based upon the presumption that family expenses are paid from community funds. [Citations.] If at the time of the acquisition of the property in dispute, it can be shown that all community income in the commingled account has been exhausted by family expenses, then all funds remaining in the account at the time the property was purchased were necessarily separate funds." (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 612.)

Indirect tracing by this "family living expense" or "recapitulation" method allows the tracing of payments "to a separate property source by showing community income *at the time of the payments or purchase* was exhausted by family expense, so that the payments or purchase necessarily must have been made with separate property funds.

20

[Citations.]  The recapitulation must be sufficiently exhaustive to establish *not only that separate property funds were available to make the payments, but that they were actually used*.  [Citation.]  As with direct tracing, the record must demonstrate that community income was depleted *at the time the particular asset was acquired*."  (*Braud*, *supra*, 45 Cal.App.4th at pp. 823-824, italics added.)  "If funds used for acquisitions during marriage cannot otherwise be traced to their source and the [party] who has commingled property is unable to establish that there was a deficit in the community accounts when the assets were purchased, the presumption controls that property acquired by purchase during marriage is community property."  (*See v. See* (1966) 64 Cal.2d 778, 784.)

Thus, to establish through indirect tracing that the Florida Street property was acquired solely with his separate property funds, George had to show that his $20,000 payment to his sister Rosalie when he acquired the property from her in 1997 and his subsequent payments on the property were necessarily made with his separate property funds because at the time he made them, all community income was exhausted by family expenses.  To make that showing, George relied on Addleman's written report and testimony regarding her separate property tracing.  Addleman reported that she performed *direct* tracing by reviewing "various bank statements from approximately December 2000 through the date of separation"  She performed *indirect* tracing based on her "review of the parties' personal tax returns and [George's] Union Bank of California account ending #9724 . . . to determine the character of funds used for transactions related to various residential and commercial properties inherited and owned by [George]."

21

As noted, George acquired the Florida Street property from Rosalie in 1997. Addleman conceded that for the period from 1996 through 2000, she lacked the documentation regarding the parties' community expenses and income that she used to perform tracing for the period of 2001 to the date of separation in 2011. She stated in her written report: "*Account statements were not received prior to 2001; therefore, we reviewed the income reported on the parties' personal tax returns* [for that period]. For 2001 through 2011, we analyzed the available community income from Farmers and community expenses included in [George's] Union Bank account." [¶] The parties reported income from various sources on the personal tax returns from 1996 through 2000. (Italics added.) She further stated: "*At this time, documentation has not been received to determine the community living expenses during 1996 through 2000.* As detailed above [in a breakdown of total annual income for the years 1996 through 2000], minimal income was available to support the family's lifestyle." (Italics added.)

She summarized her indirect tracing as follows: "The indirect tracing concluded the parties had minimal income available from 1996 through 2000 for payment of community living expenses and that from 2001 through 2011, community expenses exceeded Mr. DeLuca's community income. Therefore, there were no community funds available to acquire a community interest in the real estate owned by [George]."

At trial, Addleman testified that she performed indirect tracing for two different time periods: 1996 through 2000 and 2001 through 2011. She explained: "The first time period I did not have bank statements so to prepare that indirect tracing I just relied on the personal tax returns to review what community income would have been available

22

for community expenses. [¶] Based on my review of those tax returns, I found that there was minimal community income available. Per my Exhibit K, which was provided at my deposition, I determined that approximately $86,549 could have been deposited into the Union Bank No. 9724 account that was used to pay the separate [*sic*] property expenses.[9] [¶] Based on my understanding of the [parties'] lifestyle to meet that income amount over a four year period was minimal that could have been available for separate [*sic*] property expenses."[10] She later added: "I just reviewed the personal tax returns [for 1996 through 2000] and looked at the income that was reported by both parties. I then understood that Ms. Deluca's income would be reported under the wages

---

9       Read in context, it appears Addleman meant to say that Union Bank account No. 9724 was used to pay the *community* expenses. She earlier testified that community property income from George's insurance agency went into that account.
        Exhibit K, attached to Addleman's written report, sets forth the parties' income from various sources and total annual income reported on their joint tax returns for 1996 through 2000 as follows: $53,398 (1996), $70,422 (1997), $86,963 (1998), $34,332 (1999), and $51,997 (2000.) It is unclear how Addleman determined from these amounts that the parties could have deposited only $86,549 over a four-year period to pay community expenses.

10      Although this sentence makes little sense structurally, presumably Addleman meant to say that the Union Bank account was used to pay the *community property* expenses and that over a four-year period, the amount of the parties' community income available to pay *community property* expenses was minimal.

[subtotal] for the tax returns and Mr. Deluca's income would be community

income . . . reported under the Schedule C income for his Farmers Insurance business."[11]

Addleman's tracing evidence is insufficient to rebut the community property

presumption as to the Florida Street property because it fails to establish that the source

of funds paid on the property from the time George acquired it in 1997 through 2000 was

necessarily George's separate property.  The only documents Addleman reviewed for the

period of 1996 through 2000 were tax returns to ascertain community income.  She noted

in her report that she lacked documentation "to determine the community living expenses

during 1996 through 2000."  Based on George and Rosalinda's tax returns and her

"understanding of [their] lifestyle," Addleman surmised that community expenses

exceeded community income, stating "minimal income was available to support the

family's lifestyle."

The income information on the parties' tax returns alone is insufficient to

determine whether at the specific times that George acquired the Florida Street property

---

[11]     Addleman explained her indirect tracing for the period *2001 through 2011* as follows:  "I reviewed the Farmers Insurance Group bank statements which was where all of the community income from George Deluca's Farmers Insurance business had been and I quantified the total amount of deposits that were deposited into the Union Bank account.  [¶]  Based on my, I believe Exhibit L, I quantified total deposits from 2001 through 2011 of $987,890 community deposits from Farmers Insurance Group.  Based on my review of the bank statements, I went through and quantified all community expenses during that time period from 2001 through 2011 and determined that community expenses totaled $1,564,651.  Therefore, the community expenses far exceeded the available community income of approximately $1 million.  Based on that analysis, there would have been no community funds available to be used towards Mr. George Deluca's separate property."

24

in 1997 and made payments on the property through the year 2000, community income was exhausted by family expenses such that the initial $20,000 cash payment and subsequent loan payments on the property were necessarily made with George's separate property funds.  Addleman's summary of her indirect tracing in her written report is telling.  As noted, her report states:  "The indirect tracing concluded the parties had *minimal* income available from 1996 through 2000 for payment of community living expenses and that *from 2001 through 2011, community expenses exceeded Mr. DeLuca's community income*."  (Italics added.)  Thus, in the same sentence Addleman expressly concluded that community expenses exceeded community income—the required finding—from 2001 through 2011, but merely suggested the same was true for 1996 through 2000.  This discrepancy between Addleman's indirect tracing for the two time periods resulted from her lack of documentation of the parties' community expenses for the period of 1996 through 2000.[12]

---

[12]     Rosalinda's expert Kaseno identified the flaw in Addleman's indirect tracing analysis, noting that she "did not do an analysis of living expenses of the parties during [1996 through 2000,] which is a crucial component of an indirect tracing."  Kaseno observed that Addleman "attempted to use the data that she obtained by doing the work in 2001 through 2011 to say what expenses might have been during the 1996 through 2000 time period, but without doing a full analysis, you don't know what those expenses were. It's speculative."  When asked whether it was important to analyze "community expenses based on their records" in doing indirect tracing, Kaseno answered, "Yes.  To my understanding of an indirect tracing, that's the whole reason you do it, to show that there was a certain amount of community income and that all of that community income was exhausted.  If you don't do a complete and accurate analysis of the actual expenses during that time period, you don't know for sure if that community income was exhausted."

Addleman's surmise that the parties during a particular time period had "minimal" income available for community expenses falls short of the required showing that a particular payment for acquisition of a property or payment on a loan against the property was necessarily made with separate property funds. As noted, to rebut the community property presumption by indirect tracing, the record must show that community income was depleted when the asset in question was acquired, and that separate property funds were actually used to make payments on the asset. (*Braud*, *supra*, 45 Cal.App.4th at pp. 823-824.) Addleman's opinion that community income between 1996 and 2001 was "minimal" is insufficient to satisfy George's burden of showing that when he paid the $20,000 to his sister for the property and that when he made payments on the property between 1997 and 2001, all community income was exhausted by family expenses.[13]

---

[13] George testified that his $20,000 cash payment to Rosalie came from a Union Bank account that was solely in his name prior to his opening the Union Bank account numbered 9724, into which community funds were deposited. However, George's testimony does not establish that all the funds in that account were separate property funds when he made that payment to Rosalie. The fact that an account was solely in his name does not establish that funds deposited in the account during the marriage were separate rather than community funds.

4. *Rosalinda's signing the quitclaim deed and spousal acknowledgement regarding the Florida Street property did not transmute the property to George's separate property.*

On appeal, George contends that Rosalinda agreed the Florida Street property would be George's separate property by signing the quitclaim deed and spousal acknowledgement regarding the property. He claims substantial evidence supports the court's finding that Rosalinda executed the quitclaim deed and spousal acknowledgment "freely and voluntarily, and with full knowledge of all the facts, and with understanding of the effect of the transfers."[14] Rosalinda contends the court erred in making that finding.

"In property-related transactions between spouses, . . . section 721, subdivision (b) 'imposes a duty of the highest good faith and fair dealing on each spouse . . . .' This duty stems from the 'general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other,' prohibiting each spouse from taking 'any unfair advantage of the other.' [Citation.] Thus, ' "[i]f one spouse secures an advantage from the transaction, a statutory presumption arises under section 721 that the advantaged spouse exercised undue influence and the transaction will be set aside." ' [Citation.] An advantage results to one spouse when that spouse gains or when the other spouse is hurt by the transaction. [Citation.] A spouse obtains an advantage

---

14    George does not refer to Rosalinda's signing the quitclaim deed as a transmutation on appeal but, as noted, his counsel argued at trial that in signing the quitclaim deed, Rosalinda was "transmuting her interest." He also argued that in signing quitclaim deeds to various properties, Rosalinda "knew, if there were any interest, she was transmuting it, but she also knew she had no interest in those properties. None."

when the 'spouse's position is improved, he or she obtains a favorable opportunity, or otherwise gains, benefits, or profits. [Citation.]' [Citation.] The presumption is rebuttable; the spouse advantaged by the transaction must establish that the disadvantaged spouse acted freely and voluntarily, with ' " ' "full knowledge of all the facts, and with a complete understanding of the effect of" the transaction.' " ' " (*Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1353.)

Here, the statutory presumption of undue influence arises because Rosalinda's signing the quitclaim deed and spousal acknowledgement regarding the Florida Street property were transactions by which George sought to obtain an advantage. Specifically, he sought to extinguish any community interest that his acquisition of the property may have created and hold title as his sole and separate property. We conclude the evidence does not support the court's finding that Rosalinda executed the quitclaim deed and spousal acknowledgment with a complete understanding of the effect of those transactions. Although there was evidence that George informed Rosalinda of the facts and circumstances surrounding his acquisition of the Florida Street property from his sister and that she knew the terms of the agreement by which George acquired the property, it is undisputed that George told her the property was part of his inheritance, and that he truly believed it was part of his inheritance when he acquired it and throughout the marriage. Rosalinda's testimony that George told her his lender needed the quitclaim deed "to get everything through" was uncontroverted, as was her testimony that she did not seek legal advice before signing the quitclaim deed because she trusted George and "just signed it."

28

Thus, the evidence showed Rosalinda signed the quitclaim deed and spousal acknowledgement under a mistaken view of her rights and the legal effect of the agreement, having accepted George's erroneous representation that the property was part of his inheritance and therefore was his sole and separate property. There was no evidence that she was aware the Florida Street property was presumptively community property because George acquired it by purchase, or that she freely and voluntarily intended to transmute any community interest in the property to George's sole and separate property. Therefore, the trial court erred in finding George rebutted the presumption that he exercised undue influence in obtaining Rosalinda's signature on the quitclaim deed and spousal acknowledgment regarding the Florida Street property.

The quitclaim deed and spousal acknowledgement could not operate to transmute Rosalinda's community property interest in the Florida Street property to George's separate property because neither document satisfied the statutory requirements for a transmutation. Under section 850, subdivision (a), "married persons may by agreement or transfer, with or without consideration, . . . [¶] [t]ransmute community property to separate property of either spouse." Section 852, subdivision (a), provides: "A transmutation of real or personal property is not valid unless made in writing by an *express declaration* that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected." (Italics added.)

"[A] writing satisfies the 'express declaration' requirement *only if it states on its face* that a change in the character or ownership of the subject property is being made." (*In re Marriage of Benson* (2005) 36 Cal.4th 1096, 1100, italics added.) "An 'express

29

declaration' does not require use of the terms 'transmutation,' 'community property,' 'separate property,' or a particular locution. [Citation.] . . . . [However, t]*he express declaration must unambiguously indicate a change in character or ownership of property*. [Citation.] A party does not 'slip into a transmutation by accident.' [Citation.] [¶] In deciding whether a transmutation has occurred, we interpret the written instruments independently, without resort to extrinsic evidence. [Citations.] . . . [W]e are not bound by the interpretation given to the written instruments by the trial court." (*In re Marriage of Starkman* (2005) 129 Cal.App.4th 659, 664.)

The quitclaim deed and spousal acknowledgement regarding the Florida Street property do not satisfy the transmutation requirements of section 852 and related case law because neither document contains language expressly stating that the characterization or ownership of the Florida Street property was being *changed* from community property to separate property. The quitclaim deed states, in relevant part that "for a valuable consideration, receipt of which is hereby acknowledged, ROSALINDA DE LUCA, spouse of [George does] hereby REMISE, RELEASE AND FOREVER QUITCLAIM to GEORGE E. DE LUCA, a married man as his sole and separate property the [Florida Street property.]" The spousal acknowledgement states, in relevant part: "[Rosalinda] claims no ownership rights in the [Florida Street property.]" There is no express reference in either document to a community property interest in the property or any change in the character or ownership of the Florida Street property. Consequently, neither document could effectively transmute Rosalinda's community property interest in the Florida Street property.

30

The record contains no substantial evidence that Rosalinda intended a transmutation of community property to separate property when she signed the quitclaim deed and spousal acknowledgement regarding the Florida Street property. Uncontroverted evidence showed that George believed the Florida Street property was his separate property by inheritance, that Rosalinda accepted George's representations to that effect, and that her understanding when she signed the quitclaim deed and spousal acknowledgement was that she was merely signing documents required by a lender that were not changing the character of the property. Rosalinda did not transmute her community property interest in the Florida Street property to George's separate property under section 852.

5. *George is entitled to reimbursement under section 2640*

Although George did not rebut the presumption that the Florida Street property is community property, because there was substantial evidence that a substantial portion of the payments on the property during marriage were made from George's separate property funds, he is entitled to reimbursement of his separate property contributions under section 2640.

Section 2640, subdivision (b) provides: "In the division of the community estate under this division, unless a party has made a written waiver of the right to reimbursement or has signed a writing that has the effect of a waiver, the party shall be reimbursed for the party's contributions to the acquisition of property of the community property estate to the extent the party traces the contributions to a separate property source. The amount reimbursed shall be without interest or adjustment for change in

31

monetary values and may not exceed the net value of the property at the time of the division."  Section 2640, subdivision (a) provides:  " 'Contributions to the acquisition of property,' as used in this section, include downpayments, payments for improvements, and payments that reduce the principal of a loan used to finance the purchase or improvement of the property but do not include payments of interest on the loan or payments made for maintenance, insurance, or taxation of the property."

"Under section 2640, [a party's] separate property contribution is reimbursed *prior* to the division of community property.  [Citations.]  If there is insufficient equity at the time of dissolution in the property to which the contribution was made to fully reimburse the contribution, the entire asset is awarded to the contributing spouse."  (*In re Marriage of Walrath* (1998) 17 Cal.4th 907, 913 (*Walrath*).)[15]  Accordingly, we will remand for a determination of the amount of reimbursement to which George is entitled for his traceable separate property contributions to the Florida Street property.  After George is reimbursed for his separate property contributions to the property, the trial court will have to determine the remaining community interest in the property and effectuate an equal division of that interest.

---

[15]     "The effect of section 2640 was 'to overturn a long line of cases which had held that absent an agreement to the contrary, separate property contributions to the community were deemed to be gifts to the community.' "  (*Walrath*, *supra*, 17 Cal.4th at p. 918.)

## A.  *Spousal Support Award*

George contends the court erred by failing to reduce his income available for spousal support by the amount of monthly loan principal payments he is required to make on his income-producing properties.  He argues the court abused its discretion by "imputing" the amount of his monthly loan payments to him as "phantom income" and awarding Rosalinda monthly spousal support of $7,500, despite finding that the maximum monthly income available to him to support the children after making his loan payments was $7,281.

At trial, George's expert Addleman testified that she determined the amount of George's income "less the principal payments" he made on the loans against his rental properties because "[t]he loans had been in place as of the date of marriage and prior to the date of separation . . . ."  If George had taken out the loans after the date of separation, she would not have considered them, but the loans were "part of the [parties'] marital lifestyle, how they operated."  She testified that George's principal payments should not be included in his income available for support because "[George] generates earnings from rental properties . . . .  That income is generated because loan payments are made and that loan is in good standing.  Should that property or loan be not in good standing there is potential that that property could . . . be lost and, therefore, not generate the rental income that it is generating.  [¶]  In order for [George] to continue to earn this . . . money, those loans need to be serviced and payments need to be made."

Rosalinda's expert Kaseno disagreed with Addleman's subtracting George's loan principal payments from his income available for support.  She explained, "Payments of

principal [are] not normally deducted from a party's income available for support. When you're paying off your principal, you're basically increasing your net worth. You are paying money that is paid down on your debt obligation. It's not an expense, an accounting term, and it's basically increasing your net worth."[16] The court rejected Addleman and George's position and included George's principal payments in his income available for support.

"Permanent spousal support 'is governed by the statutory scheme set forth in sections 4300 through 4360. Section 4330 authorizes the trial court to order a party to pay spousal support in an amount, and for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances set forth in section 4320.' [Citations.] The statutory factors include the supporting spouse's ability to pay; the needs of each spouse

---

[16]     Kaseno further testified that George had increased his mortgage payments shortly before the date of separation by refinancing certain properties, stating: "There were several refinances that took place shortly before separation that went from longer term loans down to 15 year loans or seven year loans and what this does is it increases the amount of principal that is paid down with each payment so it increases the payment and increases the amount that is being paid down on principal." Kaseno was specifically questioned about the portion of Addleman's written report/declaration stating that George paid $2,035,000 in cash to purchase the family residential property on San Fernando Street in San Diego, referred to as the "San Fernando property," and that $485,000 of the purchase price came from his refinancing the Encinitas property. When the court asked why it was "a problem" to deduct George's principal payments on the Encinitas property from his income available for support, Kaseno testified: "We're reducing someone's income available for support so they're going to have less money to pay support because they purchased their residence for cash. I just don't think that's what we do is deduct what we're paying down on a loan on another property to lessen our income that we have to pay support."

based on the marital standard of living; the obligations and assets of each spouse, including separate property; and any other factors pertinent to a just and equitable award. (§ 4320, subds. (c)-(e), (n).) 'The trial court has broad discretion in balancing the applicable statutory factors and determining the appropriate weight to accord to each, but it may not be arbitrary and must both recognize and apply each applicable factor.' " (*In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1442-1443 (*Blazer*).) Failure to consider each applicable factor is reversible error. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 304 (*Cheriton*).)[17]

"As a general rule, we review spousal support orders under the deferential abuse of discretion standard. [Citation.] We examine the challenged order for legal and factual support. 'As long as the court exercised its discretion along legal lines, its decision will be affirmed on appeal if there is substantial evidence to support it.' [Citations.] 'To the extent that a trial court's exercise of discretion is based on the facts of the case, it will be

---

[17] George contends the trial court committed reversible error because it failed to consider the factor set forth in section 4320, subdivision (e), which is "[t]he obligations and assets, including the separate property, of each party." We agree. George correctly notes that the court's final statement of decision and judgment lists and addresses each of the factors set forth in section 4320, and after listing the subdivision (e) factor, states: "(See discussion below)[.]" However, the remainder of the judgment/statement of decision does not address the "obligations and assets" factor, which is particularly important in this case because George's net worth is vastly greater than Rosalinda's, due largely to his real property assets. "Under [section 4320, subdivision (c)], a key factor is the supporting party's 'ability to pay,' which encompasses assets as well as income. [Citations.] Thus, it is 'proper for the court to look to assets controlled by husband, other than income, as a basis for the award [of spousal support].' " (*Cheriton*, *supra*, 92 Cal.App.4th at pp. 304-305.) We will direct the trial court on remand to consider all of the applicable factors specified in section 4320.

upheld "as long as its determination is within the range of the evidence presented." '
[Citation.] [¶] Where a question of law is presented on undisputed facts, appellate
review is de novo." (*Blazer*, *supra*, 176 Cal.App.4th at p. 1443.) "[W]e affirm the trial
court's decision if it is supported in fact and law." (*Id.* at p. 1447.)

The question raised by George's appeal is whether a trial court should deduct
principal payments a spouse makes on business loans—including loans secured by
income producing property—from income available for support. California case law
provides little help in addressing this issue.

George relies on *Blazer* in arguing it was an abuse of discretion to include his
principal payments as income available for support. In *Blazer*, the parties principal
marital asset was a company created by the husband and a partner. (*Blazer*, *supra*, 176
Cal.App.4th at p. 1441.) On appeal from her permanent spousal support award, the wife
contended the court abused its discretion by excluding from the husband's income
available for support a portion of his business income used to capitalize and vertically
integrate the business. (*Id.* at pp. 1441, 1444.) The trial court excluded that income
based on its finding that the business's need to maintain higher capitalization and
diversify its work were reasonable business expenses that " 'should be taken out of the
company before assessing what [the husband's] reasonable income [was] for purposes of
support.' " (*Id.* at p. 1444.) The *Blazer* court concluded, among other things, that there
was no abuse of discretion because the trial court's reasonable expense finding was
supported by substantial evidence. (*Id.* at p. 1447.)

36

*Blazer* supports the proposition that reasonable business expenses may be properly excluded from a spouse's business income in determining income available for spousal support. However, the deduction from income allowed in *Blazer* was business income reinvested in the business; it was not income used for mortgage or business loan payments that directly increased the payor spouse's net worth by decreasing debt. Thus, *Blazer* does not specifically address the question of whether business income used to pay down business debt should be included in or excluded from income available for support. However, a number of out-of-state authorities provide guidance on this issue. Although most of those cases address income available for *child* support and we recognize that there are important differences between spousal support and child support, the analysis of available income for child support provides useful guidance in resolving available-income issues regarding spousal support.

Some decisions support a general rule that principal payments should be excluded from income. Ohio courts generally view principal payments on business loans or mortgages on income-producing properties as business expenses that should be excluded from income available for support, particularly when the loan is an "acquisition" loan rather than a refinancing or "equity" loan. (*Orecchio v. Colantoni*, 2010-Ohio-2849 ¶ 29 [2010 Ohio App. Lexis 2356, p. **11]);[18] *DeCapua v. DeCapua*, (Ohio Ct.App., Jan. 8,

---

[18]    Rule 3.4 of the Ohio Supreme Court Rules for the Reporting of Opinions states: "All opinions of the courts of appeals issued after May 1, 2002 may be cited as legal authority and weighted as deemed appropriate by the courts without regard to whether the opinion was published or in what form it was published." (Ohio Rep.Op.R. 3.4.)

1992, No. 2651) 1992 Ohio App. Lexis 86, p. *8 [husband's principal payments on business loans represented ordinary and necessary business expenses to be subtracted from his income available for child support where the money borrowed was used for fixtures, leasehold improvements, and operating expenses, and the husband did not accelerate or prepay the principal on any of the loans, but rather paid the loans according to their terms].) And in *Betancourt v. Betancourt* (Fla. 2010) 50 So.3d 768 (*Betancourt*), the Florida appellate court concluded the "trial court erred in attributing to the [husband] the gross rental income from a rental property without first deducting the mortgage payment and other expenses associated with the property." (*Betancourt*, at p. 769; accord, *In re Albert* (N.H. 2007) 922 A.2d 643, 645, 647 [Trial court erred by including the husband's mortgage payments on two rental properties in determining his income available for child support where statutory definition of "gross income" for purposes of child support included "net rental income."].)

Other jurisdictions have taken a seemingly opposite approach, adopting a general policy of including principal payments in income available for support either because such payments are not considered to be ordinary and necessary business expenses or because they benefit the payor spouse by increasing net worth. (See *Lawrence v. Tise* (N.C. 1992) 419 S.E.2d 176, 182 [mortgage principal payments are not an ordinary and necessary business expense within the meaning of state child support guidelines]; *Campo v. Roberts* (La. 1996) 677 So.2d 1042 [same]; *In re Marriage of Nikolaisen* (Mont. 1993) 847 P.2d 287, 292 [principal payments that increased husband's net equity should not have been deducted from his income available for child support]; *In re Marriage of Dean*

38

(Kan. 2018) 437 P.3d 46 [principal payments are not properly deducted from income for purposes of support because they increase the payor's net worth].)

Noting different views articulated by courts on this issue, the Wyoming Supreme Court has adopted a middle-ground approach we find both thoughtful and workable. In *Fleenor v. Fleenor* (Wyo. 1999) 992 P.2d 1065 (*Fleenor*), the mother argued that the trial court abused its discretion in deciding the father's principal payment on a business mortgage was deductible from his income available for support as a reasonable unreimbursed business expense. (*Id.* at p. 1069.) Highlighting a split of authority on the issue of whether such principal payments are properly deducted from a parent's income in determining support, the *Fleenor* court observed that North Carolina and Montana did not allow principal payments to be deducted as a legitimate business expense, whereas "Illinois, Indiana, Colorado, and Delaware appear to find it discretionary whether principal payments should be deducted from net income for child support purposes."[19] (*Fleenor*, at p. 1069.) Jurisdictions in this latter category have decided "that a parent's ability to pay was directly connected to debt reduction expenses reasonably necessary for the production of income. Rather than adopting a view that debt reduction represented

_____

[19]    Courts in Utah and New Mexico have similarly ruled that trial courts have discretion to include or exclude principal payments based on the relevant circumstances. (See *Bingham v. Bingham* (Utah 1994) 872 P.2d 1065, 1067, fn. 2 ["deductibility of particular expenses poses a question of fact, turning on whether such expenses are necessary, and, if so, whether or not they exceed those required for the business's operation at a reasonable level"]; *Klinksiek v. Klinksiek* (N.M. 2004) 104 P.3d 559 [trial court erred in excluding payments that increased mother's equity in property from her income available for child support, although trial court on remand was to determine whether any portion of mother's rental income would properly be excluded as ordinary and necessary business expenses].)

increased net equity, these courts adopted the view that it is 'unsound to consider the cash coming into the husband's business as flowing through to net income without deducting (to the extent that they are reasonable) the items which must be taken from his cash flow in order to maintain his business operations.' " (*Ibid.*) *Fleenor* explains that "[a] trial court retains discretion concerning principal payments because it is recognized that principal payments may be unreasonably excessive or because assets were acquired to depress income to avoid support payments." (*Ibid.*)

The Wyoming high court ultimately concluded that "[t]he crux of this issue is whether principal payments resulting in increased asset value but decreased cash flow should be permitted to reduce a parent's income for purposes of child support. . . . [W]e find that reasonable principal payments can be considered unreimbursed expenses although, over time, net equity increases. Our review of the authorities persuades us that we should establish as our general rule that *the principal portion of a business mortgage payment may be deductible if, in its discretion, the [trial] court determines that the payment reasonably and legitimately reduces net income for child support purposes. The [trial] court will retain the discretion to decide if the principal portion of business debt reduction payments is excessive, or assets were acquired to reduce child support payments, or [there are] other circumstances indicating the principal payments are not reasonable, unreimbursed, or legitimate.*" (*Fleenor*, *supra*, 992 P.2d at p. 1070, italics added.)

We conclude that the italicized language in *Fleenor* articulates a reasonable and workable rule for trial courts faced with the issue of whether principal payments on loans

40

against income-producing properties or business debt in general should be deducted from a party's income available for spousal or child support. Although such principal payments may increase an obligor spouse's net worth, a trial court retains the discretion to deduct a payment from income available for support if it finds, based on substantial evidence, that the payment reasonably and legitimately reduces the spouse's net income available for support, considering the totality of the relevant circumstances, including the extent to which the payment constitutes an ordinary and necessary business expense and whether disallowing the deduction would work a substantial hardship on the payor spouse.[20] The trial court also has discretion to disallow the deduction of principal payments on business debt from a party's income available for support under appropriate circumstances, such as where the court reasonably finds the principal payments are excessive, the property encumbered by the loan in question was acquired for the purpose of lowering income available for support, or the payments are unnecessary for the operation of the business at a reasonable level. Accordingly, we will reverse the spousal

---

[20] Section 4320, subdivision (k) requires the trial court to consider "[t]he balance of the hardships to each party" in determining spousal support.

41

support award and remand the matter for a redetermination of the support issue consistent

with the principles outlined in this opinion.[21]

[21]     We recognize that in *In re Marriage of Brandes* (2015) 239 Cal.App.4th 1461, this court declined to resolve a spousal support issue on appeal because the court's partial reversal of the judgment on a community property issue potentially rendered the support issue moot. The *Brandes* court noted that "[a]mong other key factors, in setting spousal support the court must consider the 'assets, including the separate property, of each party.' (§ 4320, subd. (e).) A spouse's share of community property are assets included in the equation." (*Id.* at p. 1490.) Although Rosalinda 's share of the community's interest in the Florida Street property will likely increase her separate estate for purposes of the court's spousal support determination under section 4320, we have decided George's appeal on the merits because George's income from his rental properties will be a substantial factor in the court's redetermination of spousal support, and the court will have to decide whether his principal payments on those properties, or some portion of those payments, should be included in his income available for support, notwithstanding any increase in Rosalinda's separate property estate.

DISPOSITION

The portions of the judgment finding that the Florida Street property is George's separate property, finding that George's monthly income available for support is $25,332, and awarding Rosalinda monthly spousal support in the amount of $7,500 are reversed. The matter is remanded to the trial court for further proceedings to: (1) determine the amount of reimbursement to which George is entitled under section 2640 for his separate property contributions to the acquisition of the Florida Street property; (2) determine the community's remaining interest in the Florida Street property and divide that interest, if any, between George and Rosalinda; and (3) reconsider the spousal support award in accordance with the views expressed in this opinion and consideration of all of the relevant factors under section 4320. In all other respects, the judgment is affirmed. The parties are to bear their own costs on appeal.

DATO, J.

WE CONCUR:


McCONNELL, P. J.


BENKE, J.

43